UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

EUGENE LIBBETT

                Defendant.

<u>REPORT & RECOMMENDATION</u>

05-CR-6069L

---

**<u>PRELIMINARY STATEMENT</u>**

By Order of Hon. David G. Larimer, United States District Judge, dated May 6, 2005, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 5).

Defendant Eugene Libbett is charged in a four-count indictment.  The first count charges Libbett with possessing ammunition after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Count Two of the Indictment charges Libbett with possessing a firearm with a barrel less than eighteen inches in length and an overall length of less than twenty-six inches, in violation of 26 U.S.C. §§ 5822, 5845(a)(1), 5845(a)(2), 5861(c) and 5871.  The third count charges Libbett with possessing a firearm (*i.e.*, the firearm identified in Count Two of the Indictment) that was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5845(a)(1), 5845(a)(2), 5861(d) and 5871.  The final count charges Libbett with possessing cocaine base, in violation of 21 U.S.C. § 844(a).  Each count

alleges that the charged crime occurred on or about April 21, 2005.  (Docket # 4).  Currently

before this Court for Report and Recommendation are Libbett's motions to suppress statements

and physical evidence.  (Docket # 30).[1]


## FACTUAL BACKGROUND

On May 24 and June 2, 2006, this Court conducted an evidentiary hearing on

Libbett's motions to suppress.  At the hearing, the government offered the testimony of

Rochester Police Sergeants Clifton Manns and Ron Bryant, as well as Officers Bryan DiSalvo

and James Ingerick.  Eugene Libbett testified on behalf of the defense.  The following constitutes

this Court's findings of fact.


**Testimony Offered by Government Witnesses**

On April 21, 2005, shortly before 5:00 a.m., Officer Ingerick was on patrol in the

city of Rochester near the intersection of Jefferson Avenue and West Main Street.  While in his

patrol vehicle, Ingerick observed a blue Dodge Shadow parked at a Sunoco gas station.

According to Ingerick, this particular area of the city has a high concentration of criminal

activity, including a high incidence of stolen vehicles, narcotics and firearms-related activities

and prostitution. (Tr.B 69).  Ingerick was also aware that there had been a recent increase in the

---

[1]  Libbett's omnibus motions also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence, a bill of particulars and the preservation of rough notes.  (Docket # 30).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on May 4, 2006.  (Docket ## 35, 36).

number of stolen automobiles in the area and that the Dodge Shadow was a model that was "commonly" stolen.  (Tr.B 69-70).

Ingerick was parked in a parking lot across the street from the gas station, and he observed two black males exit the station and enter the blue Dodge.  As the Dodge pulled out onto Jefferson Avenue, Ingerick observed the two occupants "jumping around," which prompted him to follow the vehicle.  (Tr.B 70-71, 115).  After approximately thirty seconds, Ingerick observed the car drive through a stop sign on Wentworth Avenue without coming to a complete stop.  About ten seconds later, the vehicle drove through another stop sign without stopping at the intersection of Wentworth Avenue and Brown Street.  Rather than conducting an immediate traffic stop, Ingerick attempted to check the vehicle's license plate number to determine whether the car had been reported stolen.  (Tr.B 74-75).  Before receiving a response, Ingerick observed the vehicle turn onto Brown Street and drive away at a high rate of speed.  (Tr.B 75).

Ingerick continued to follow the blue Dodge Shadow from a distance of approximately twenty-five to fifty feet.  (Tr.B 78).  As he followed, Ingerick observed the vehicle travel at inconsistent speeds and begin to weave across the roadway with the driver's door open.  (Tr.B 77).  The Dodge drove around the block, eventually returning to Campbell Street.  At that point, Ingerick transmitted a radio broadcast requesting assistance from other officers.  The car then came to a stop in the road in front of 301 Campbell Street and the driver, later identified as Libbett, exited and ran away, leaving the car in the roadway with the door open.  (Tr.B 77-78).  Ingerick parked his patrol vehicle behind the blue Dodge and pursued Libbett on foot.  (Tr.B 80).  Ingerick did not see what happened to the passenger of the vehicle.  (Tr.B 79).

3

Ingerick testified that as Libbett left the car, he was carrying a long, dark object that Ingerick believed to be a firearm.  (Tr.B 80).  As Libbett ran around the house at 301 Campbell Street, he temporarily passed from Ingerick's view.  When Ingerick reached the house, he looked around the corner and saw Libbett climbing over a three-foot fence approximately fifteen to twenty feet away.  At that point, Libbett no longer appeared to be carrying the long, dark object that Ingerick had previously observed.  (Tr.B 83).  Ingerick followed Libbett over the fence and pursued him as he traveled along the driveway at 307 Campbell Street.  (Tr.B 84).  Libbett continued to flee across the street and into the backyard at 307 Campbell Street.  (Tr.B 85-86).  Ingerick pursued Libbett into the backyard, where he observed him climb over a six-foot stockade fence.  (Tr.B 84, 86).  Although Ingerick did not follow him over the stockade fence, he continued to pursue him in the direction that he fled and observed Libbett again as he was walking toward the corner of Whitney and Orange Streets.  (Tr.B 87, 88).

During the pursuit, Ingerick had broadcast a description of Libbett as a black male, wearing a red "doo-rag," black leather jacket, blue jeans and red or brown boots.  (Tr.B 87).  Sergeant Manns, Sergeant Bryant and Officer DiSalvo, among others, responded to Ingerick's call for assistance.  (Tr.A 8; Tr.B 5-6, 40).  Sergeant Manns and Officer DiSalvo assisted in the search for Libbett by establishing a perimeter around the area in which he had been observed and conducting a search of the backyards.  (Tr.A 8-9; Tr.B 7-8).  As the officers searched, Sergeant Bryant secured Ingerick's police vehicle and inspected the blue Dodge Shadow.  (Tr.B 40).  The Dodge remained in the roadway with the engine running and the driver's door open.  (Tr.B 40-41, 45).  Bryant looked inside the open door and observed a red cloth bag on the center console.  Believing that bag might contain evidence relating to the

4

weapon reported by Ingerick, Bryant looked inside and discovered four twelve-gauge shotgun shells.  (Tr.B 43, 46).  Bryant left the bag where it was in the car and transmitted a radio broadcast to the officers searching for Libbett that ammunition had been discovered in the vehicle.  (Tr.B 46).

Meanwhile, Sergeant Manns was walking in the backyard at 369 Orange Street and observed a "semi-enclosed" rear porch attached to that residence.  He looked inside the porch and discovered Libbett, sweating profusely and wearing a red doo-rag, black leather jacket, blue jeans and red or brown boots.[2]  (Tr.A 10, 22, 26, 32; Tr.B 10).  Manns asked Libbett whether he lived at the residence, but Libbett did not respond.  (Tr.A 10-11).  Manns then stated, "I need to see your hands," and Libbett complied.  (Tr.A 12).

DiSalvo was searching a neighboring yard when he heard Manns talking to Libbett.  He then entered the area and assisted by conducting a "pat search" of Libbett for possible weapons, during which he discovered a small pocket knife.  (Tr.B 10-11, 13).  DiSalvo also used his flashlight to look into Libbett's shirt pocket and observed a small, shiny object. Unsure what the object was, DiSalvo reached into Libbett's pocket and discovered a clear plastic bag containing a substance he believed to be crack cocaine.[3]  (Tr.B 11-12).  DiSalvo also noticed that the right side of Libbett's shirt was torn and that his hand was bleeding.  (Tr.B 36-37).

Following the search, Libbett was arrested and DiSalvo placed him in the rear seat of a police vehicle.  (Tr.B 13).  As Libbett was getting into the vehicle, he asked, "Why did he

---

[2]  The record is unclear whether Libbett was wearing the red doo-rag and black leather jacket at the time he was discovered on the porch at 369 Orange Street, or whether those items were located on the porch near his person. (Tr.A 26, 31-32; Tr.B 16).

[3]  Upon cross examination, DiSalvo testified that a cellular telephone was also discovered on Libbett's person.  (Tr.B 26).

pull me over?" (Tr.B 15). That statement was not made in response to any questions by DiSalvo

or any other officer, nor did any officer say anything to Libbett in response. (Tr.B 15). DiSalvo

also recovered a red doo-rag and a black leather jacket from the porch on which Libbett was

arrested. (Tr.B 16). The clothing was found next to where Libbett had been sitting and the

doo-rag appeared to have sweat on it. (Tr.B 16).

   As Libbett was sitting in the back seat of DiSalvo's police car, Officer Ingerick

arrived, observed Libbett and identified him as the suspect he had earlier been pursuing. (Tr.A

15; Tr.B 17, 91). Following the identification, Libbett was transported to the hospital because he

was complaining of chest pains. (Tr.B 36).

   After the positive identification of Libbett, Ingerick and Bryant searched the area

through which Libbett had run. (Tr.B 47, 96). In the backyard of 307 Campbell Street, lying in

the grass, Ingerick discovered a small plastic bag with a red apple design printed on it.

Contained within that bag were three smaller plastic bags. Two of the smaller bags were

stamped with a red "S" and contained a small rock-like substance that the officers believed to be

crack cocaine. The third bag had a yellow imprint and also contained suspected crack cocaine.

(Tr.B 96-97). Additionally, Ingerick also discovered a pair of eyeglasses in the backyard. The

items were discovered in the path in which Libbett had run and were dry even though the grass

was wet from an earlier rain. (Tr.B 97). In addition, Ingerick and Bryant observed a footprint in

the mud where Libbett had crossed over a fence. "Within throwing down distance" of that

footprint, Bryant discovered a sawed-off shotgun. (Tr.B 48, 98). The shotgun, which was also

dry, appeared to be the same size and shape of the object that Ingerick had observed Libbett

carrying when he fled from the car. (Tr.B 98). Bryant then transmitted a radio broadcast

regarding the discovery of the firearm and called for a technician to recover the weapon.  (Tr.B 49).

Once the evidence was recovered, the blue Dodge Shadow was towed to a lot. (Tr.B 101-03).  According to Ingerick, before it was towed, an inventory search was conducted, the purpose of which was to ensure that no firearms or objects were in the vehicle that could pose a hazard to the public and to note any items that were removed and whether there was any damage to the vehicle.  (Tr.B 101, 103).  Ingerick also issued three traffic tickets to Libbett for failing to come to a complete stop at the stop signs.  (Tr.B 103).  Ingerick ultimately received notification that the blue Dodge Shadow was registered to Anita Kern in Manchester, New York. (Tr.B 104).

Later that day, Sergeant Bryant contacted Libbett at the hospital.  Libbett asked Bryant, "Red [Bryant's nickname], what's going on? What can you do for me?"  (Tr.B 65). Bryant did not respond because he was advised by other officers that Libbett had requested an attorney.  (Tr.B 66).


**Testimony of Eugene Libbett**

Eugene Libbett testified that on April 21, 2005, he was residing at 301 Campbell Street, apartment two.  (Tr.B 154).  At approximately 4:50 a.m. that day, Libbett left his residence and drove to the Sunoco gas station in a blue Dodge Shadow for the purpose of purchasing a pack of cigarettes and some cigars.  Libbett had borrowed the vehicle from a friend known only as "Chris," whom Libbett understood to be the boyfriend of Anita Kern.  (Tr.B 154-55).

At the gas station, Libbett met an individual he knew from the neighborhood as "Shaw" and agreed to provide him a ride to Lyell Avenue. (Tr.B 158). When Libbett walked out of the store, he observed a police vehicle immediately to the right of the Dodge Shadow. (Tr.B 159). Libbett and Shaw then entered the Dodge and exited the gas station onto West Main Street. As he drove away, Libbett testified, the police car followed from a distance of less than one yard. (Tr.B 160-61). Libbett continued to drive and stated that he stopped at every stop sign and traffic light. Throughout the journey, the police car remained "directly behind" his car. (Tr.B 161-71). Eventually Libbett stopped at a stop sign and signaled a left turn onto Campbell Street. At that time, the police car activated its emergency lights. (Tr.B 171). Instead of pulling over, however, Libbett continued to drive around the block, claiming that he was afraid he would go to jail because he did not have a driver's license. (Tr.B 190). Libbett testified that his door remained closed, but that the passenger was "acting jittery" and opening and closing his door. (Tr.B 182). When he reached the area in front of 301 Campbell Street, Libbett stopped the car and ran. (Tr.B 185, 192). He testified that he put the car in "park," pulled "over a little bit to the curb" and may have left the door open. (Tr.B 185).

On cross-examination, Libbett admitted that he had used cocaine and alcohol several hours before operating the vehicle. (Tr.B 173, 176-77). Libbett further indicated that he had received additional cocaine from Shaw and that he was under the influence of cocaine while driving. (Tr.B 173). Finally, Libbett testified that he was wearing a red doo-rag and black leather jacket and was in possession of cocaine when he exited the car in front of 301 Campbell Street. He testified that he did not possess a sawed-off shotgun. (Tr.B 186-87).

## REPORT AND RECOMMENDATION

Libbett moves to suppress all evidence seized from his person, the blue Dodge Shadow and from the backyard at 307 Campbell Street.  He also seeks suppression of all statements made by him following his arrest.  According to Libbett, the initial traffic stop by Officer Ingerick of the car he was driving was unlawful, and thus all evidence seized and statements made subsequent to that traffic stop should be suppressed as the impermissible fruit of the stop.  (Docket ## 30, 45).  The government opposes both of Libbett's motions.  (Docket ## 33, 46).

## I.  Motion to Suppress Tangible Evidence

Libbett contends that the initial traffic stop of the Dodge Shadow was unlawful because Officer Ingerick lacked reasonable suspicion to conduct the stop.  As the Second Circuit has observed, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment.  *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994).  A traffic stop must be justified by probable cause or "reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994); *citing Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot")); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence seized as the result

of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *Scopo*, 19 F.3d at 781 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996). Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *United States v. Bayless*, 921 F. Supp. at 213, that the search or seizure did not violate the Fourth Amendment. *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir.1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

In this matter, the parties dispute whether Libbett was actually subjected to a traffic stop. According to Officer Ingerick's testimony, he was merely following Libbett's car and had not activated his emergency lights when Libbett stopped his car in the middle of the road, exited the vehicle and fled on foot, leaving the engine running and the door open. (Tr.B 77-78). Alternatively, Libbett testified that the police car had activated its emergency lights and that, rather than pulling over, he continued to drive until he reached 301 Campbell Street, where he parked the car and fled. (Tr.B 190-92). Although I find the testimony offered by Libbett, who conceded that he was under the influence of crack cocaine while operating the automobile (Tr.B

10

173), to be less reliable and trustworthy than that offered by Ingerick, I need not resolve the

factual dispute in any event.  Regardless of whether Officer Ingerick attempted to perform a

traffic stop, Libbett concedes that he did not submit to that authority.  As the Supreme Court has

determined, an officer's attempt to conduct a traffic stop does not constitute a seizure under the

Fourth Amendment.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  For a seizure to occur,

there must be "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of

authority."  *Id.* at 626 (emphasis in original); *see United States v. Swindle*, 407 F.3d 562, 572-73

(2d Cir. 2005) (attempted traffic stop that would have been unsupported by reasonable suspicion

did not violate Fourth Amendment because defendant did not submit to officer's authority, but

continued to drive, committed traffic infractions and eventually fled on foot), *cert. denied*, 126 S.

Ct. 279 (2005).  Accordingly, because no Fourth Amendment seizure occurred, Libbett's motion

to suppress evidence as the fruit of an unconstitutional stop should be denied.

     **A.**  **Evidence Seized from Libbett's Person**:  Having determined that no traffic

stop was effected, this Court must now consider the legality of the officers' initial detention and

search of Libbett.

     Like a traffic stop, a *Terry* stop requires that an officer reasonably believe that

criminal activity is afoot.  *Terry v. Ohio*, 329 U.S. at 30; *Berkemer v. McCarthy*, 468 U.S. 420,

439 (1984) (analogizing traffic stop to *Terry* stop).  Unlike a full "probable cause" search, a

*Terry* protective search must be of a character that can be described as a "minimal intrusion."

*Illinois v. Wardlow*, 528 U.S. 119, 126 (2000) ("The *Terry* stop is a far more minimal intrusion

[than an arrest], simply allowing the officer to briefly investigate further"); *United States v.*

*Place*, 462 U.S. 696, 703 (1983) ("When the nature and extent of the detention are minimally

intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause").

In determining whether a *Terry* stop was supported by reasonable suspicion, a court must take into account the totality of the circumstances viewed "through the eyes of a reasonable and cautious police officer on the scene [and] guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quotation omitted), *cert. denied*, 529 U.S. 1061 (2000).  While "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted [the stop]," *Florida v. J.L.*, 529 U.S. 266, 271 (2000), the "[i]nformation known by one officer prior to a *Terry* stop is imputed to all officers who are involved in the investigative detention." *United States v. Hoskie*, 2000 WL 1092022, *4 (D. Conn. 2000); *see also Illinois v. Andreas*, 463 U.S. 765, 771, n.5 (1983) (knowledge of one officer presumed to be shared by all involved in investigation).

Here, Ingerick observed Libbett drive through two stop signs without stopping. (Tr.B 70-75).  Further, Libbett fled from the Dodge Shadow and, as he did so, Ingerick observed that he was carrying a long, dark object that Ingerick believed to be a firearm.  (Tr.B 77-80). After making these observations, Ingerick transmitted a radio broadcast to other officers in the area, reporting Libbett's flight, potential possession of a firearm and describing his appearance. (Tr.A 8; Tr.B 5-6, 40, 80).  I find that it was reasonable for the officers involved, upon receipt of that broadcast, to have believed that criminal activity may have been afoot. *See Terry*, 392 U.S. at 30 (officer may conduct brief stop if he observes conduct leading him to reasonably believe "criminal activity may be afoot").

Such reasonable suspicion permitted Sergeant Manns and Officer DiSalvo, once they discovered Libbett on the porch at 369 Orange Street and determined that he fit the description provided by Ingerick, to detain him and to perform a protective pat-search.  *See id.* (officer may lawfully conduct brief stop and frisk for weapons).  It was during this search that DiSalvo noticed a shiny object in Libbett's shirt pocket.  Unsure what the object was, DiSalvo removed it and discovered that it was a plastic bag containing crack cocaine.  (Tr.B 10-13).

The record is unclear as to when the discovery of the crack cocaine from Libbett's pocket was made during the course of the relatively brief sequence of events.  Specifically, the record does not reveal whether the discovery of the crack cocaine occurred before or after Sergeant Bryant's broadcast to the other officers that he had discovered ammunition in the Dodge Shadow.

If Bryant's transmission regarding his discovery of the ammunition had been made before Manns and DiSalvo apprehended Libbett, then, in view of the suspected firearm Ingerick had observed Libbett carrying, the reasonable suspicion to stop and frisk Libbett would have ripened into probable cause to arrest him, and the search of his shirt pocket would have been justified as a search incident to that arrest.  *See United States v. Robinson*, 414 U.S. 218, 235 (1973) (lawful custodial arrest authorizes "a full search of the person" arrested).  If, however, the search of Libbett's pocket had been performed before Bryant's announcement, then DiSalvo may have exceeded his authority to conduct a pat-frisk under *Terry* at the time he reached into

Libbett's pocket.[4]  Even so, under the doctrine of inevitable discovery, suppression would not be warranted.

Minutes after Libbett was found, Ingerick and Bryant discovered a dry shotgun and additional crack cocaine on the wet ground as they were searching Libbett's flight route. (Tr.B 47, 96-97).  The discovery of this additional evidence gave rise to probable cause to arrest Libbett.  Thus, even if the search of Libbett's pocket had been conducted prior to the discovery of the ammunition, shotgun and additional crack cocaine, the discovery of that additional evidence inevitably would have led to Libbett's arrest (who was being detained at the time for investigative purposes),[5] search of his person incident to that arrest and the discovery of crack cocaine in his shirt pocket.  *See United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992) (inevitable discovery exception to exclusionary rule "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred"), *cert. denied*, 510 U.S. 1045 (1994); *United States v. Roberts*, 852 F.2d 671, 675-76 (2d Cir. 1988) (government must prove that "'evidence would have been obtained inevitably' even if there had been no statutory or constitutional

---

[4]  While DiSalvo plainly was authorized to search for weapons, his testimony fell short of establishing that he believed or even suspected that the small dime-sized object was a weapon.  (Tr.B 12, 31).  When asked if he suspected that the object was a weapon or "something else," he replied, "I really wasn't sure what it was at the time, that's why I went and took it out . . . ."  (Tr.B 12).

[5]  It is unclear from the record precisely when in relation to the initial detention of Libbett the shotgun and narcotics were discovered in the yard at 307 Campbell Street.  However, in light of Ingerick's observation that Libbett appeared to be carrying a firearm at the initiation of the pursuit and that he was no longer carrying it during the later portion of the pursuit, the officers would have been justified in detaining Libbett upon his apprehension as a search was conducted in the area through which he fled.  *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("cases impose no rigid time limitation on *Terry* stops"); *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) ("If the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*").

violation") (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)), *cert. denied*, 488 U.S. 993
(1988).

As a result, because I find that probable cause to arrest Libbett existed prior to the
search of his pocket or, alternatively, that he inevitably would have been arrested and searched
following the discovery of the ammunition (in the car he was driving), narcotics and firearm
(along his flight route), I recommend that Libbett's motion to suppress the crack cocaine seized
from his shirt pocket be denied.

B. **Evidence Seized from Dodge Shadow**:  Libbett also moves to suppress the
four shotgun shells seized from the Dodge Shadow.  (Docket ## 30, 45).  A defendant seeking to
suppress evidence must demonstrate by a preponderance of the evidence that he had a reasonable
expectation of privacy in the location or items searched.  *Rakas v. Illinois*, 439 U.S. 128, 143
(1978); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993); *United States v. Osorio*, 949
F.2d 38, 40 (2d Cir. 1991).  This expectation of privacy must be both subjectively and objectively
reasonable – that is, the defendant must have a subjective expectation of privacy and that
expectation must be one that is deemed objectively reasonable by society at large.  *United States
v. Fields*, 113 F.3d 313, 320 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Osorio*,
949 F.2d at 40.

While the Fourth Amendment to the United States Constitution guarantees
protection against unreasonable searches and seizures, "[w]hen a person voluntarily abandons
property, . . . he forfeits any reasonable expectation of privacy that he might have had in the
property." *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (citing *United States v.
Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987), *cert. denied*, 507 U.S. 954 (1993)).  Thus, the

protections of the Fourth Amendment do not extend to abandoned property.  *Id.* (citing *United States v. Moskowitz*, 883 F.2d 1142, 1147 (2d Cir. 1989)).

Here, Libbett has submitted a sworn affidavit and offered testimony indicating that he had the owner's permission to operate the Dodge Shadow.  (Docket # 30, Ex. A; Tr.B 154-55).  While Libbett's affidavit and testimony may be sufficient to establish a reasonable expectation of privacy in the Dodge Shadow, the Court need not decide that issue.  Instead, before Officer Ingerick attempted to conduct a traffic stop of the vehicle, Libbett fled on foot, leaving the driver's door open and the engine running.  Libbett's flight constituted an abandonment of the automobile, and a concomitant abandonment of any expectation of privacy he may have had in the vehicle.[6]  *See, e.g., United States v. Edwards*, 441 F.2d 749, 751-52 (5th Cir. 1971) (defendant had no expectation of privacy in car he abandoned by fleeing from police on foot); *United States v. Gonzalez*, 912 F. Supp. 256, 258 (S.D. Tex. 1995) ("if the Court decides that the agents lawfully pursued [d]efendant and [d]efendant voluntarily abandoned the vehicle, [d]efendant would have no standing to challenge the search"); *United States v. Clarke*, 1993 WL 478374, *2 (S.D.N.Y. 1993) ("defendant's flight from their vehicle after very brief valid questioning constituted a voluntary abandonment, not coercion, and the ensuing search of the vehicle was lawful").  *See also United States v. Levasseur*, 816 F.2d at 44.  Accordingly, Libbett may not challenge the search of the Dodge Shadow, and it is my recommendation that Libbett's motion to suppress the shotgun shells be denied.

---

[6] Libbett contends that his abandonment of the car should be disregarded because it was the result of an unlawful traffic stop.  Having found that no traffic stop was conducted, I reject Libbett's argument.

C.  **Evidence Seized from Yard at 307 Campbell Street:**  The final category of evidence Libbett seeks to suppress is the evidence that was discovered in the backyard at 307 Campbell Street, which consists of the shotgun, the eyeglasses and another bag of crack cocaine. (Docket ## 30, 45).  As stated above, it is Libbett's burden to establish a reasonable expectation of privacy in either the location searched or the items seized.  *See Rakas v. Illinois*, 439 U.S. at 143.  Libbett has failed, however, to offer any affidavit or testimony concerning the evidence seized from 307 Campbell Street.  Libbett simply has not established any expectation of privacy in the premises or the items, and his motion to suppress should be denied.  Moreover, even if Libbett could establish standing, he clearly abandoned the property as he fled from Officer Ingerick.  Thus, for the reasons stated above, Libbett's motion should be denied on that basis as well.

## II.  Motion to Suppress Statements

Finally, Libbett also moves to suppress statements made by him following his arrest.  (Docket # 30).  It is, of course, well-settled that statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v.* Arizona, 384 U.S. at 444.

17

Generally excepted from the *Miranda* requirements, however, are statements spontaneously made by a defendant. The Supreme Court has recognized that statements made by a defendant that are not elicited in response to interrogation do not violate the Fifth Amendment. *See Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980). As the Court has reasoned:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478; *see also Rhode Island v. Innis*, 446 U.S. at 299-300.

Here, following Libbett's arrest, Officer DiSalvo placed him in the rear seat of his police car. As Libbett was getting into the vehicle, he asked, "Why did he pull me over." (Tr.B 15). In addition, later that day, after Libbett was transported to the hospital for an injury to his hand, Libbett asked Sergeant Bryant, "Red, what's going on? What can you do for me?" (Tr.B 66). Both of these statements were spontaneously made by Libbett without prompting or questioning by the officers. In addition, neither officer replied or responded in any way to Libbett's communications. (Tr.B 15, 66). On this record, I find that Libbett's statements were entirely spontaneous and were not obtained in violation of his Fifth Amendment rights. I therefore recommend that Libbett's motion to suppress the statements made by him following his arrest on April 21, 2005 be denied.

## CONCLUSION

For the foregoing reasons, it is my recommendation that Libbett's motions to suppress statements and physical evidence **(Docket # 30)** be **DENIED**.


<u>  *s/Marian W. Payson*                   </u>
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       August  15  , 2006.

19

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                              *s/Marian W. Payson*
                                 MARIAN W. PAYSON
                             United States Magistrate Judge

Dated: Rochester, New York
        August   15  , 2006.

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).